**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

CIVIL ACTION NO. 04-105-JBC

COMMONWEALTH LAND TITLE
INSURANCE COMPANY,                                                    PLAINTIFF,

V.                              MEMORANDUM OPINION AND ORDER

GRAOCH ASSOCIATES #73,                                              DEFENDANT.

* * * * * * * * * *

This matter is before the court on the parties' cross motions for summary

judgment.  (R. 38, R. 40).  The court will grant the plaintiff's motion and will deny

the defendant's motion.

**II.    Factual Background**

This coverage dispute involves a title insurance policy issued by the plaintiff,

Commonwealth Land Title Insurance Company ("CLT"), to the defendant, Groach

Associates # 73 ("Graoch").  Graoch purchased the subject property, which

included the Sonnet Cove apartment buildings within the Lakeview  Estates

subdivision, in February 2000.  CLT issued the policy with the effective date of

February 9, 2000.  R. 38, Exh. 1.  The policy provided title insurance for two tracts

of land located in the Lakeview Estates subdivision in Lexington, Kentucky.  R. 40.

The policy provided coverage to Graoch for loss or damage sustained or incurred in

certain circumstances, including: (1) "Any defect in or lien or encumbrance on the

1

title;" (2) "Unmarketability of the title;" and (3) "Lack of a right to access to and

from the land."  Schedule B of the policy specifically exempted "Restrictive

covenants recorded in Deed Book 900, Page 10 . . . Said restrictive covenants

contain covenants for maintenance assessments which create a lien against the lots

of Lakeview Estates."  R 38, Exh.1.

　　　　The Schedule B exemption referred to a 1967 Covenant for maintenance of

the lake and common areas.  R. 40, Exh. B.  Although neither Graoch's deed nor

the CLT policy identified any amendments to the 1967 Covenant, three

amendments had been filed in 1970, 1976, and 1978, respectively.  R. 38, Exh.

8–10.  The first amendment, executed on August 25, 1970, identified the

members' easements of use and enjoyment of the common properties.  R. 38, Exh.

8.  The second, executed on June 19, 1976, designated certain adjacent properties

as members of the Lakeview Estates Lake Association ("LELA"), Inc., assigned

voting and membership rights to those new properties and their owners, and

subjected the properties to annual and special assessments.  R. 38, Exh. 9.  The

third amendment, executed on April 11, 1978, amended the covenants pertaining

to multi-family residential projects.  Although Graoch believed it was responsible for

three assessment shares, pursuant to the second amendment, Graoch was actually

responsible for one assessment for every four dwelling units for annual

assessments and one assessment for every ten dwelling units for capital

improvements.  R.38, Exh. 9.  In addition, in 2001, LELA increased assessments

2

against its members.  R. 38, Exh. 10.  Graoch unsuccessfully challenged the assessments, at which point it discovered that the amendments existed.  R. 38, Exh. 13; *Graoch Assocs. #73 L.P. v. Lakeview Estates Ass'n*, 2004 Ky. Ct. App. LEXIS 352 (Ky. App. Dec. 10, 2004).  LELA filed a notice of its lien for the past-due assessments and late charges on September 25, 2008.  R. 38, Exh. 14.

### III.   Analysis

The issue is whether CLT may be held liable for assessments stemming from an assessment policy that purportedly constituted a title defect at the time the policy was issued.  Title insurance is a contract for indemnification under which the insurer indemnifies the insured against losses sustained in the event that a lien or encumbrance affecting title to property is discovered.  Am. Jur. 2d Abstracts of Title § 16 (2009).  Because title insurance does not insure that no lien or encumbrance will be found, "no action for failing to find a defect will lie on the basis of the title policy alone."  *Id.*  In other words, an insured's claim must be based on the policy itself rather than on negligence.  *Id.*  Furthermore, "[a] title policy's identification of matters excepted in a schedule is not the equivalent of a title abstract, a title search, or a representation as to title."  Absent a statutory or judicial duty to search, a title search conducted by a title insurer is not for the benefit of the insured.  *See* Law of Title Insurance § 12.02 (2006).

### A.   The Exclusion of the 1967 Restrictive Covenant from Coverage Did Not  Exclude Subsequent Amendments to that Covenant.

CLT argues that "having excluded coverage for the restrictive covenants, it

3

follows necessarily that the policy excludes coverage for any subsequent changes the Lakeview Association may have made to the covenants and would have been superfluous for the policy to expressly state any amendments to covenants that are already excluded from coverage."   R. 42, 6.  Graoch concedes that a title insurer has no duty to disclose a matter already exempted from coverage, but argues that the amendments were *not* exempted from the policy.  R. 41, 9.  Graoch notes that the subsequent amendments created new obligations, including the requirement in the second amendment that extended liability to multi-family developments (instead of on a per-lot basis), and therefore cannot be considered as simply modifying already excluded provisions.  *Id.*

The language of the policy itself does not make it clear that the coverage exclusion would also apply to any amendments to that covenant.  R. 38, Exh. 1.  Rather, the policy specifically excluded "[r]estrictive covenants recorded in Deed Book 900, Page 10," i.e., the 1967 Covenant.  *Id.*  CLT could have included a blanket exemption for any amendments to those covenants, which would not have required it to find and identify any particular amendments.  "Kentucky has consistently recognized that an ambiguous policy is to be construed against the drafter, and so as to effectuate the policy of indemnity."  *Bituinous Cas. Corp. v. Kenway Contr., Inc.*, 240 S.W.3d 633, 638 (Ky. 2007) (citation omitted).  Given this ambiguity, the contract must be construed as not excluding coverage for maintenance assessments pursuant to amendments to the covenant.

4

**B.      Although the Assessments Were Not Excluded From Coverage, They Did Not Constitute a Title Defect, a Lien, or Render the Title Unmarketable, and Therefore Did Not Trigger Coverage under the Policy.**

Graoch argues that the formula for computing assessment obligations was a title defect existing at the time the policy was issued and was not otherwise excluded from coverage.  Defective title is "[a] title that cannot legally convey the property to which it applies, usually because of some conflicting claim to that property." *City of Flint*, 346 F. Supp. 1282, 1285 (E.D. Mich. 1972).  A defect in title exists when "the aggregate or rights, privileges and powers known as ownership is subject to the claims of others." *Id.* at 1284.

Graoch analogizes to *Bel-Air Motel Corp. v. Title Ins. Corp. of Pa.,* arguing that it bought its property subject to the obligation to pay the LELA assessments, which were a "certainty" that created a title defect covered by the policy.  R. 4, 4. In *Bel-Air,* the Supreme Court of New Jersey held that an assessment became a defect at the time the improvement was completed.  444 A.2d 1119, 1120 (N.J. 1981).  That improvement was authorized by a 1963 ordinance which called for an assessment of the cost of the improvement against the benefitted properties.  *Id.* The court concluded that the title defect was created in 1967 when the improvement was completed, reasoning that "[t]he fact the local improvement had been completed made the eventual assessment of the property a certainty." *Id.* at 1122.  The court noted further that the assessment, when "confirmed," would become a lien against the property, and that these circumstances "prevented the

5

title to the property from being 'relatively free from doubt.'"   In contrast to *Bel-Air*, Graoch has not identified any improvements that were completed at the time of the policy's issuance that would have made the assessments a certainty.  Rather, the amendments in question seem more like the 1963 ordinance establishing that improvements and subsequent assessments would be forthcoming.

Graoch also looks to *Atlanta Title and Trust Co. v. Inman* in support of its argument that a title defect existed at time of the policy's issuance.  155 S.E. 364 (Ga. 1930).  In that case, the Court of Appeals of Georgia held that an assessment became a lien when an ordinance was enacted declaring the assessment to be a lien upon the property.  *Id.* at 365.  In *Atlanta Title*, a 1919 amendment to the City of Atlanta's charter provided that the lien of all assessments for public improvements would attach upon the entry of the completion of such work in a book in the Comptroller's Office.  *Id.* at 364.  A 1921 charter amendment authorized the City to acquire land and to assess the costs to property owners.  *Id.* at 365.  A 1925 ordinance declared these assessments "to be a lien on and upon the property against which they are assessed."  *Id.*  The court concluded that the assessment became a lien against the property when the 1925 amendment declared the assessments to be a lien.  The use of the word "shall" in the instant policy, however, distinguishes this case from *Atlanta Title*.  "[S]hall" indicates that the assessment would become a lien at some future date, whereas in *Atlanta Title* the ordinance purported to declare the assessment a lien. Thus in contrast to

6

*Atlanta Title*, the assessments here did not constitute a lien on the property when the policy was issued.

Rather, title insurance policies "generally have been held to include coverage for assessments existing at the time the insurance is issued, but not to cover assessments that are rendered after that time, even though the right to levy the assessment existed at the time of the insurance."  Couch on Insurance 3d. § 159:36 (June 2009).  *See also Butcher v. Burton Abstract & Title Co.*, 216 N.W.2d 434 (Mich. 1974); *Metropolitan Life Insurance Company v. Union Trust*, 6 N.Y.S.2d 410 (N.Y. 1938).

This distinction between assessments generally and those that are past due is also reflected in the second amendment itself.  Section 1 and Section 9 of Article VI of the second amendment indicate that outstanding payment obligations create a lien on the property.  Section 1 of Article VI provides that assessments, "together with such late charges thereon and costs of collection thereof as hereinafter provided," shall be a continuing lien on the property.  Section 9 of Article VI specifically deals with the effect of non-payment of assessments, and states that if an assessment becomes delinquent, "then such assessment shall, together with such late charges thereon and the cost of collection thereof as hereinafter provided, thereupon become a continuing lien on the property . . .."  Thus Section 1 and Section 9 indicate that the assessments become liens on the property only when they are overdue, i.e. when accompanied by late charges and collection costs.

7

Because there were no payments due when the policy was issued, the assessments did not constitute a lien on the property triggering coverage under the policy.

### 3.  Unmarketability

The assessment policy did not render title unmarketable.  The policy defines unmarketability of title as

> an alleged or apparent matter affecting the title to the land, not excluded or excepted from coverage, which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title.

Graoch argues that the title was unmarketable because it would have been released from the purchase contract had it discovered the enforceability of the amendments. Graoch asserts that its assessment share and voting rights made the property unsalable, yet offers no evidence in support of that assertion.

Graoch also argues that although the policy did not define "marketability" (it only defined "unmarketability"), the court should take this term into account. According to Graoch, marketability of title includes ensuring that "no flaw or doubt will arise to disturb [the property's] market value." R. 38 at 15.  In *Hinton Hardwoods, Inc. v. Cumberland Scrap Processors Transp., LLC*, No. 2008-CA-000362, 2008 WL 5429569 (Ky. App. Dec. 31, 2008), upon which Groach relies, the Kentucky Court of Appeals considered a breach-of-contract claim arising out of a contract for the purchase of real estate.  Before the transaction was completed, it was discovered that no recorded easement allowed access over the railroad tracks

8

which crossed the property. *Id.* at *1.  The purchaser contended that the lack of

an easement constituted a defect in marketable title to the real estate. *Id.*  The

seller argued that no defect existed and sought to enforce the contract. *Id.* at *5.

The court noted that the property was essentially landlocked, rendering it useless

for industrial purposes. *Id*. at *5.  The court also acknowledged that the parties

were not aware of the lack of an easement, and determined that this mutual

mistake inhibited the requisite "meeting of the minds." *Id.* at *6.  Because the title

was not *"*marketable as anticipated," the court concluded that rescission was the

appropriate remedy. *Id*.  Graoch argues that in the instant case, the high

assessments similarly decimate the value of the land.  In contrast to *Hintwood*,

however, Graoch is not prevented from using the land as it had anticipated, nor has

it otherwise shown that the market impact in this case rises to the level of that in

*Hintwood.*

Finally, Graoch argues that the title was unmarketable because Graoch

"became liable for any loss occasioned by the undisclosed assessments and was

forced into litigation concerning the characterization and enforceability of the

assessment."  R. 41, 12.  Graoch initiated this litigation in 2001 following LELA's

increase of its members' assessments.  Thus it seems that the impetus for litigation

was the 2001 assessment increase, which occurred after the policy's issuance, as

opposed to the assessment policy outlined in the second amendment.  Graoch has

not shown that this is the type of litigation that title insurance protects against.

9

For these reasons, the facts of this case do not indicate that Graoch was entitled to coverage for unmarketability of title.

### C.    Lack of Access to the Lake

Graoch lost access to the lake due to its failure to pay assessments which were charged after the issuance of the title policy.  Graoch had a legal obligation to pay those assessments, and its failure to do so brought about the termination of its access to the lake.  The policy does not provide coverage for defects "suffered, assumed or agreed to by the insured claimant" or "attaching or created subsequent to Date of Policy."  Because Graoch's claim about its lack of access falls into both of these categories, is not entitled to coverage for its lack of access

## IV.    Conclusion

Accordingly, it is **ORDERED** that CLT's motion, R. 40,  is **GRANTED** and Graoch's motion, R. 38,  is **DENIED.**

Signed on  March 25, 2010



JENNIFER B. COFFMAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY